UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

        Plaintiff,

                                    Case No. 20-cr-88-pp

    v.

JORGE BARRAGAN,

        Defendant.

**ORDER GRANTING DEFENDANT'S MOTION TO REOPEN DETENTION (DKT. NO. 131) AND DENYING DEFENDANT'S REQUEST FOR RELEASE PENDING TRIAL (DKT. NO. 131)**

On June 16, 2020, the grand jury indicted the defendant and fifteen others, alleging that between May 1, 2019 and June 16, 2020, they participated in a year-long conspiracy to distribute 100 grams or more of heroin, 500 grams or more of cocaine, twenty-eight grams or more of crack and fifty grams or more of methamphetamine. Dkt. No. 1. Under 18 U.S.C. §3142(e)(3)(A), the charged offense gave rise to a rebuttable presumption that there was no condition of or combination of conditions that would reasonably assure the defendant's appearance as required and the safety of the community. Two days later, the defendant made his initial appearance before Magistrate Judge Stephen C. Dries; the government requested a three-day hold and Judge Dries scheduled a detention hearing for June 23, 2020 at 11:00 a.m. Dkt. No. 19 at 2.

1

Pretrial services prepared a bond study for Judge Dries. Dkt. No. 44. The report reflects that the defendant has a criminal history dating back to 1994, when he was adjudicated delinquent for battery. Id. at 4. He had another adjudication in 1995 (possession of a dangerous weapon by a child), and adult convictions for battery and bail jumping (misdemeanor), battery to a police officer (felony), felon in possession of a firearm (federal felony) and conspiracy to possess with intent to distribute and to distribute cocaine and cocaine base (federal felony). Id. at 4-6. The federal felony convictions occurred in 2001 and 2005; the defendant started his term of supervised release in the 2005 felony on October 26, 2017, so he was on supervised release at the time of the offense charged in the indictment. Id. at 5-6. The report also indicated that in relation to his 1998 conviction for battery to a police officer, the defendant's probation was revoked because he had absconded for approximately two years, then been arrested on new charges. Id. at 5. The report indicated that the defendant lived by himself, and that he had been working full-time for the past two years at a roofing company. Id. at 1-2.

At the detention hearing, the government advised Judge Dries that the defendant faced a mandatory minimum sentence of five years if convicted and argued that he had an extensive criminal record and was on supervised release for a similar federal offense at the time of his alleged involvement in the current offense. Dkt. No. 66. The government told Judge Dries that the evidence was strong; it explained that the case arose from a wiretap. The government told the court that packaging materials and baggies testing positive for cocaine were

2

found in the defendant's residence, as well as marijuana, a pistol and $60,000 in cash (which the defendant and his girlfriend asserted was not theirs). Id. The defendant responded that he owned his own home, was a member of his local union and had been working for two years. Id. He said that he had family in the area—a mother, a sister and a granddaughter. Id. He asked for release on GPS monitoring so he could continue working, arguing that the case was likely to take a long time. Id. Judge Dries found that despite the defendant's community ties, he had not overcome the presumption of detention. Id.

On September 24, 2020, the defendant filed a motion asking Judge Dries to reconsider his order of detention. Dkt. No. 120. The defendant argued that in his prior orders, Judge Dries had not explained how the defendant had failed to satisfy the standard under 18 U.S.C. §3143(a)(1). Id. at 1. The defendant first argued that he is not a danger to the community. Id. at 2. He asserted that the strength of the government's evidence against him is not strong. Id. at 3. He indicated that the wiretap that was placed on his cell phone shows that he was in communication with Juan Gonzalez, but argued that there are no conversations showing that he ever supplied Gonzalez or anyone else with heroin, methamphetamines or cocaine. Id. He pointed to the affidavit in support of the application for the wiretap, in which the government said that the defendant got his drugs from UM1-278 and supplied them to Gonzalez. Id. The defendant asserted that the only information the government provided to substantiate this claim was the statement that on occasion, the defendant and Gonzalez would to go see UM1-278 for resupply together, and other times they

3

would go alone. Id. The defendant asserted that the government had not provided proof of these "occasions," other than some texts in which the defendant and Gonzalez talked about going to the "store" together. Id. The defendant says the audio and video evidence indicate that Gonzalez repeatedly talked about his supplier being from out of town, while the defendant always has lived in Milwaukee. Id. He asserted that the government had provided no evidence that *he* had traveled out of town. Id.

The defendant asserted that the gun found at his residence was not his—he says his girlfriend, Arelia, owned it and that he did not know it existed or that she owned it. Id. at 4. He asserts that Arelia bought it legally and that she had attested to the fact that she was the sole owner. Id. She also had attested that the defendant did not know about her ownership of the gun. Id.

As for his criminal history, the defendant argued that he had not had any drug or gun charges lodged against him in fifteen years. Id. He pointed out that his most recent conviction was from March of 2005, and argued that all of his convictions were from his youth and young adulthood; he now is forty years old. Id. He stated that he had been submitting random drug tests since 2017, all of which had been negative, and that he had been making serious efforts to change his life for the better. Id. at 4-5.

The defendant argued that while he openly admitted that he had been a member of the Latin Kings for several years, he was no longer a member. Id. at 5. He said that while he had known Juan Gonzalez for years, their relationship was not about drugs. Id. The defendant contended that the government hung

4

its hat on one conversation, in which he and Gonzalez discussed some "legal papers" and referenced some statements in the papers to the defendant as being a Latin Kings member; the defendant asserted that there was nothing in the conversation to confirm that he was currently a member of the gang. Id.

The government had argued that the defendant participated in the conspiracy charged in the indictment while on supervised release for his prior federal offense. The defendant responded that while on release, he had been volunteering with an organization called Team Havoc, which offers "support and rehabilitation to Milwaukee community members who are prone to gang involvement and other unfortunate circumstances due to poor socioeconomic factors." Id. A leader of Team Havoc had written a letter to the court, which the defendant quoted in the motion to reconsider; Rafael Mercado described the work the defendant had been doing with the organization, speaking to others of his experiences and mistakes to help them avoid the same pitfalls. Id. at 5-6. Mr. Mercado also spoke highly of the defendant's work ethic and his generosity in volunteering his time. Id. at 6.

The defendant described his steady employment with FJA Christiansen Roofing, working full time for the company for the past two years. Id. He attached a letter from his employer, which expressed the hope that the defendant could come back to work. Id. The defendant also listed his prior jobs working for Amazon, Gear Wash and Herbalife. Id.

Next the defendant argued that he was not a flight risk. Id. at 7. He emphasized that he had lived on the south side of Milwaukee all his life, had

significant ties to the city, owned a home and had a job here. Id. He stated that he had three adult children in Wisconsin (two in Milwaukee) with whom he was close, and a new granddaughter. Id. He stated that he was in a committed relationship with Arelia Bautista (who claims ownership of the gun found in his residence), who also lives in Milwaukee, and that his mother and a sister live in the area. Id. He also indicated that he had never traveled internationally. Id.

At the end of the motion, the defendant emphasized that it could be years before his trial took place. Id. at 8. He stated that if released, he could live with his cousin or Ms. Bautista and could go back to work at FJA Christiansen. Id. He said that any concerns about releasing him could be alleviated by location monitoring. Id.

The government responded that the motion to reconsider did not identify any information that was not known to the defendant at the time of the original detention hearing. Dkt. No. 124 at 2. The government perceived that the defendant believed drug trafficking was a non-violent crime; the government responded that drug trafficking endangers the community and carries a presumption of detention. Id.

In describing the facts of the case, the government alleged that since early 2019, the defendant and others charged in the conspiracy distributed resale, distribution and user quantities of heroin, cocaine, crack and methamphetamine to customers through street-level dealers. Id. The government noted that one of the phones subject to the wiretap was the defendant's cell phone. Id. at 3. It also noted that the conspiracy involved

6

numerous controlled buys and physical surveillance of the defendant and others. Id. The government asserted that the conspiracy charged carried a mandatory minimum term of five years, but that because the defendant has a prior federal felony drug conviction, he faces a mandatory minimum sentence of ten years. Id.

The government noted that the motion to reconsider made no mention of the drug packaging materials and $60,000 in U.S. currency found in the defendant's house, which neither he nor Ms. Bautista claimed ownership of. Id. at 3-4. The government pointed out that the defense had not responded to the defendant's prior bond violations or the fact that at the time of the offense alleged in the indictment, the defendant was on supervision for essentially the same offense—participation in a drug conspiracy. Id. at 4.

The government told the court that while it never purchased drugs directly from the defendant, it did purchase heroin, crack and methamphetamines from co-conspirators; on several occasions, those controlled buys "followed intercepted phone calls to [the defendant] where Gonzaelz and [the defendant] discuss meeting with their supplier of controlled substances and arranging for the purchase of controlled substances." Id. at 7. The government went on to explain that

> [t]he coconspirator called [the defendant] to obtain the drugs before they delivered the controlled substances to confidential informants and undercover agents. Agents conducted surveillance of [the defendant] meeting with coconspirators before controlled deliveries. The intercepted phone calls though usually in code, made it clear that [the defendant] was supplying the drugs to others. During one call from a suspected supplier who asked [the defendant] if he was "good," [the defendant] indicated that he was and that he "broke it

7

down" a common practice amongst traffickers where larger quantities of drugs are broken down into smaller retain quantities. [The defendant] also communicated with a nephew who would call and indicate that he was looking for "one or two" and in subsequent calls the nephew would indicate that he needed to meet [the defendant] as he had "three or four stacks" to give [the defendant]. Urban Dictionary defines "stacks" as a term for money usually meaning $1,000. The defendant is correct there are no intercepted calls where the parties clearly state they are selling cocaine and heroin but the pattern of calls and coded words are not difficult to decipher. Add the calls to physical surveillance, evidence and the large amount of money seized from the defendant's bedroom and the inference is not difficult to connect the conduct to drug trafficking.

Id. at 7-8.

As to the defendant's argument that the firearm recovered in his home was Ms. Bautista's and he had no knowledge of it, the government responded that when it was seized, the firearm was in a cardboard gun case that clearly identified what was inside it, and that the Wisconsin State Crime Laboratory recently had recovered one of the defendant's fingerprints from the case. Id. at 8. The government indicated that it has submitted the gun for DNA testing. Id.

The government asserted that the defendant had a "history of being untruthful and violating conditions of bond and supervision." Id. It explained that during his interview with pretrial services for the bond study, and while on supervised release in the 2005 case, the defendant reported living at 2455 South 66th Street. Id. The government stated that surveillance and a GPS vehicle tracker had showed that the defendant was living and sleeping at "his girlfriend's residence"—presumably Ms. Bautista's residence—on South 65th Street, "coincidentally" the address where he was arrested in the early morning hours on June 18, 2020. Id. The defendant told the pretrial services officer that

8

he had only $1,200 in a checking account and $5,000 in stocks; the government contrasted this with the $60,000 found in the residence at the time of the defendant's arrest which neither the defendant nor Ms. Bautista claimed. Id.

The government walked through the defendant's criminal history, pointing out the number of times he'd been charged with bail jumping and had his probation revoked, culminating with his arrest in this case on allegations of offenses committed while on federal supervision. Id. at 9. The government pointed out that while it is true that the defendant has not been charged with gun or drug crimes since 2005, he was in prison for over twelve of those fifteen years. Id.

The government also asserted that the defendant posed a risk of flight. Id. at 12. It noted that he faces at least ten years in prison if convicted, providing him with an incentive to flee. Id. It inferred that he had the ability to generate significant sums of money as demonstrated by the $60,000 recovered in his home. Id. It argued that as a Latin King, the defendant would have access to Latin King members in other cities. Id. The prosecutor personally pointed to his own prosecution of the defendant's brother in 2005, asserting that the brother had fled to Mexico and that a warrant remained outstanding. Id. The government asserted that the defendant had no strong ties to Milwaukee other than his family. Id.

Judge Dries denied the motion to reconsider. Dkt. No. 125. He found that the fact that the defendants alleged spoke in code—"e.g., 'store'=drug

supplier, 'paint'=cocaine, or sometimes heroin)" did not make the evidence weaker, pointing out that a jury might find the use of coded language circumstantial evidence of illicit activity. Id. at 2. He concluded that, combined with the unexplained $60,000, the evidence was strong. Id. Given the government's revelation that the defendant's fingerprint had been found on the gun case, Judge Dries gave little weight to Ms. Bautista's affidavit that the defendant did not know about the gun. Id. at 3. He did not find compelling the defendant's argument that he had not accrued any new gun or drug charges in fifteen years, given that the "vast majority" of those years the defendant was in prison on drug charges. Id. And again, Judge Dries found significant the fact that the defendant was on federal supervision at the time he allegedly committed the offenses that gave rise to this indictment. Id. Judge Dries concluded, "although some factors support release—as they do in almost every case—the presumption of detention, the nature of the offense, the strength of the evidence, and the fact that the alleged offense was committed while on supervised release all weigh heavily in favor of detention." Id. at 4.

A month later, the defendant filed this motion, titled "Motion for De Novo Detention Hearing." Dkt. No. 131. The motion states that the defendant "will appear" before this court and will move to reopen the detention hearing under Fed. R. Crim. P. 32.1(a)(6), 18 U.S.C. §§3143(a)(1)[1] and 2145(b) and asks that the defendant be released pending trial. Id. at 1. While the defendant says he

---

[1] The court suspects the defendant meant to cite §3142; §3143 governs release pending sentencing or appeal, not pretrial release.

will "appear" in court, and the title of the motion is a request for a *de novo* "hearing," the defendant concedes that the court need not hold a hearing, but may conduct a *de novo* review of the record. Id. (citing United States v. Torres, 929 F.2d 291, 292 (7th Cir. 1991)).

In response to the government's impression that the defendant does not believe that drug trafficking is violent crime, the defendant counters that he is very aware that the charges against him are serious. Id. at 2. He reiterates that the government's evidence is "weak," because the government "never points to a single incident in which agents or confidential sources witnesses the sale of or delivery of drugs." Id. The defendant asserts that despite video and audio evidence provided in discovery, he does not appear and "there is no footage of [the defendant] involved in a single drug transaction." Id. He says that the government points only to allegedly coded telephone conversations and asserts that the fact that they are "coded" is speculation on the part of law enforcement. Id.

The defendant says that Judge Dries did not point to any other evidence beyond the coded conversations except the unexplained $60,000 and that he did not explain how that money demonstrated that the defendant was a danger to the community. Id. at 3. As to the government's statement that the lab had recovered the defendant's fingerprint on the gun box, the defendant argues that "[t]he mere presence of fingerprints on a firearm case does not indicate that [the defendant] handled a firearm," asserting that the government hasn't

11

demonstrated that the defendant was aware of the gun inside the case or that his prints were on the gun or that he posed a safety risk due to the gun. Id.

Section 3145(b) of Title 18 provides that if a magistrate judge orders someone detained, that person may file a motion "for revocation or amendment of the order." The district court conducts a *de novo* review of the evidence. See, *e.g.*, United States v. Cross, No. 20-cr-9, 2020 WL 1139841, at *1 (E.D. Wis. Mar. 9, 2020). "The district court may hold a new hearing or review the record of proceedings before the magistrate judge." Id. (citing United States v. Torres, 929 F.2d 291, 292 (7th Cir. 1991)). Given the amount of information already in the record, the court elects to review the proceedings before Judge Dries.

Whether the district court conducts a new hearing or reviews the record that was before the magistrate judge, it must it must determine under 18 U.S.C. §3142(e) whether there is any condition or combination of conditions that will reasonably assure the appearance of the person as required and the safety of the community. In making that determination, the court considers the factors enumerated in §3142(g)—the nature and circumstances of the offense charged, the weight of the evidence, the history and characteristics of the person and the nature and seriousness of the danger to any person or the community that would be posed by release. The defendant is entitled to the presumption of innocence. 18 U.S.C. §3142(j). The facts the court uses to support a finding that no conditions or combination of conditions would ensure the community's safety must be supported "by clear and convincing evidence." 18 U.S.C. §3142(f).

When a defendant has been charged with an offense under the
Controlled Substances Act that carries a maximum term of imprisonment of
ten years or more and the government seeks detention, there is a rebuttable
presumption that no condition or combination of conditions will reasonably
assure the appearance of the person and the safety of the community. 18
U.S.C. §3142(e)(3)(A). A defendant may rebut the presumption by meeting "a
'burden of production' by coming forward with some evidence that he will not
flee or endanger the community if released." United States v. Dominguez, 783
F.2d 702, 707 (7th Cir. 1986). Once the defendant has met this burden of
production, the presumption is rebutted. Id. That doesn't mean that the
presumption is "erased;" the presumption "remains in the case as an
evidentiary finding militating against release, to be weighed along with other
evidence relevant to factors listed in § 3142(g)." Id. "The burden of persuasion
remains with the government once the burden of production is met." Id. (citing
United States v. Jessup, 757 F.2d 378, 381-82 (1st Cir. 1985)).

The presumption applies here. The defendant has been charged with an
offense under the Controlled Substances Act—conspiracy to distribute
controlled substances in violation of 21 U.S.C. §§841(a)(1), 941(b)(1)(B) and
846—which carry a statutory maximum penalty of ten years or more, and the
government is seeking detention. So the defendant has the burden of coming
forward with evidence that he will not flee or endanger the community of the
court releases him.

The defendant has met his burden of production with regard to risk of flight. He told the pretrial services officer that he was born in Milwaukee and has lived in the greater Milwaukee area his whole life. Dkt. No. 44 at 1. He reported having a sister living in Milwaukee. Id. He reported that he has no passport and never has traveled outside the United States. Id. He represented to Judge Dries that he owns his own home. Dkt. No. 120-1 at 5. He has provided the court with an August 5, 2020 letter from his employer at FJA Christiansen roofing, Jeff Keller, indicating that the defendant worked there for the past couple of years and was a very good worker. Dkt. No. 120-5. He has presented proof of involvement with a community service group. Dkt. No. 120-4. This evidence is sufficient to meet the defendant's burden of production rebutting the presumption that there is no condition or combination of conditions that will assure his appearance.

The defendant also has met his burden of production to rebut the presumption that he is a danger to the community. As noted, he has demonstrated that for the past two or so years he has had a stable, legal source of income, which implies that he need not sell drugs to make a living. The letter from the representative at Team Havoc indicates that in the writer's view, the defendant is not a danger. Dkt. No. 120-4. The defendant has presented the affidavit from Arelia Bautista, indicating that the gun found in the couple's residence was hers. Dkt. No. 120-3. Because the defendant's burden of production is not a difficult one to meet, this evidence is enough to meet it.

That does not end the court's analysis. The court still must consider the factors in §3142(g) to determine whether there are conditions of release that will reasonably assure the defendant's appearance and the safety of any other person and the community.

§3142(g)(1)—the nature and circumstances of the offense charged

The defendant has been charged with conspiring with fifteen named co-defendants to distribute 100 grams or more of heroin, 500 grams or more of cocaine, twenty-eight grams or more of crack and fifty grams or more of heroin. Dkt. No. 1 at 1. The charge alleges that the conspiracy spanned at least a year, from May 2019 through June 2020. Id. Section 3142(g)(1) lists, as one of the "circumstances" that the court should consider, the question of "whether the offense . . . involves . . . a controlled substance." It does—it involves four controlled substances in large amounts. While most federal offenses are "serious," drug crimes—particularly those involving the distribution of heroin and methamphetamine given the destruction these drugs have wrought on communities across the country and the state of Wisconsin—pose a significant risk to the community. Drug crimes that involve distribution of dangerous drugs are exponentially more serious. And as the court notes, there is the rebuttable presumption, which has not been erased, and which militates against release. This factor weighs against finding that there is any condition or combination of conditions that could reasonably ensure the safety of the community.

<u>§3142(g)(2)—the weight of the evidence against the person</u>

The government sought the indictment based on a wiretap of several phones, including the defendant's cell phone. At the first detention hearing, the government stated that law enforcement found in the defendant's residence marijuana, a pistol and $60,000 which neither the defendant nor his girlfriend claimed. Dkt. No. 66. In its response to the motion to reconsider, the government explained that the wiretap had intercepted calls to and from the defendant's cell phone for thirty days and that a wiretap on a charged codefendant's phone had captured the defendant's voice. The government stated that it had conducted controlled buys of drugs from coconspirators following intercepted calls from the defendant to defendant Gonzalez in which the two discussed meeting with their supplier. Dkt. No. 124 at 7. The government reported that law enforcement had conducted surveillance of the defendant meeting with coconspirators before the controlled buys and asserted that while the phone calls were in code, it was clear that the defendant was supplying drugs to others. <u>Id.</u> The government gives a couple of examples—the defendant telling a suspected supplier that it was "good" and that he'd "broken it down," the defendant's nephew calling the defendant looking for "one or two," then later calling to tell the defendant that the nephew had "three or four stacks" to give the defendant. <u>Id.</u>

The defendant argues that the idea that the defendant was using "code" is simply speculation by law enforcement. He argues that no video shows him buying drugs from anyone or selling drugs to anyone. The defendant's

16

arguments miss the point. The indictment does not allege that the defendant bought drugs or sold drugs. It alleges that he *conspired* with—agreed with— other people to buy and sell drugs. The intercepted communications show a relationship between the defendant and coconspirators. In combination with the physical surveillance and the controlled buys, the intercepted conversations show that the defendant interacted with coconspirators around the time they were engaging in controlled buys of drugs. While the government has not proven beyond a reasonable doubt that the defendant was speaking in code, agents who investigate drug crimes are familiar with coded language (as are prosecutors who prosecute such crimes and defense attorneys who defend those accused of such crimes). At this stage of the case, the question is not whether the government has proven beyond a reasonable doubt that the defendant was talking about drugs when he spoke of "it" being "good" and "breaking it down." The question is whether all the evidence, considered together, gives a strong indication that the defendant was conspiring with others to sell drugs.

The defendant questions the significance of the $60,000 cash found in his residence. The $60,000 cash is significant in the context of the bigger picture. In the fall of 2017, the defendant was released from federal prison after serving over twelve years. After a short period of unemployment, he worked for a month or so at Amazon making $1,300 a month, a month and a half or so at Gear Wash where he made about $2,000 and a month and a half at Herbalife where he made no money. Dkt. No. 44 at 2. The bond study indicates that in

June 2018—two years prior to his arrest—he began working for FJA Christiansen where he reported making $1,800 per month—$21,600 a year, presumably before taxes. Id. At the time of his arrest, he reported having monthly expenses of $1,915 against a monthly income of $1,800, leaving him with a negative monthly cash flow.[2] Id. Yet when he was arrested, there was $60,000 in unaccounted-for *cash* in the residence. The defendant also represented in his motion to reconsider that he "owns a house in the area." Dkt. No. 120 at 7. And he reported to pretrial services that he had $1,200 in a bank account and $5,000 in stocks. Dkt. No. 44 at 2. Does the defendant's presence in a residence with $60,000 in cash—coupled with his ownership of a house, $5,000 in stocks and $1,200 in a bank account—when his income is insufficient to meet his monthly expenses prove beyond a reasonable doubt that he was supplementing his income by conspiring to sell drugs? It does not. But it is strong circumstantial evidence, combined with use of code and conversations that appear to be about drugs occurring at the same time that law enforcement is surveilling controlled buys.

---

[2] There is conflicting information in the bond study. On the first page, in the box titled "Monthly Income" under the "Defendant" section, the report states, "$3,120.00." Dkt. No. 44 at 1. On page 2, in the "Employed/Unemployed History" section, the report again indicates that the defendant's monthly income from FJA Christiansen was $3,120.00 monthly. Id. at 2. But under the "Finances" heading on page 2, the defendant's monthly income from "Salary" is listed as $1,800. Id. Even if the defendant was making $3,120 per month at FJA Christiansen and had $1,200 in disposable income leftover each month, and even if he'd saved every penny of that disposable income, it would have totaled only $28,920. It still would not explain the $60,000 in cash, and likely would not explain the house and stocks.

18

The defendant insists that the gun found in the residence was not his and that he had no idea it was there. He dismisses the discovery of his fingerprint on the cardboard gun case as insufficient to show that he handled the gun. The government stated in its response to the motion to reconsider that the cardboard gun case "clearly identified the firearm inside." Dkt. No. 124 at 8. The government also stated that law enforcement found the gun case inside "a larger box that concealed the contents." Id. The defendant is correct that the government has presented no evidence that he touched the gun inside the case. But the defendant's fingerprint on a box that identifies the item inside it as a gun contradicts the defendant's argument—and his girlfriend's assertion— that he had no idea that a gun existed. The defendant is no stranger to guns— he has a prior conviction for being a felon in possession of a firearm. Dkt. No. 44 at 6. The implication that he would not have recognized the gun box does not hold water. And the larger relevance to the court's inquiry—the strength of the evidence that the defendant was involved in a conspiracy to sell controlled substances—lies in the fact that guns are tools of the drug trade.

The court concludes that the evidence is relatively strong, and this weighs against a finding that there is any condition or combination of conditions that would assure the safety of the community.

§3142(g)(3)(A)—the history and characteristics of the person

The defendant has presented some evidence of his character—the glowing letter from his boss at the roofing company and the letter from the community organization indicating that the defendant donates his time to

helping others in the community. The bond study indicates that there is no evidence that the defendant has any significant physical or mental health conditions. Dkt. No. 44 at 3. The defendant has family ties—his girlfriend, three adult children, his sister and his mother. Dkt. No. 120 at 7. He appears to have lived in the area for most of his life when not in custody. The defendant self-reported to pretrial services that while he has a history of drug use, it is many years in the past (although the court notes there was marijuana found in the residence at the time of his arrest). These factors weigh in favor of a finding that there are conditions or combinations of conditions that could reasonably ensure the defendant's appearance and the safety of the community.

But other §3142(g)(3)(A) factors land on the other side of the scale. While the defendant had a full-time, lawful job prior to his arrest, the court has noted that it did not seem to pay him enough to meet his expenses, or if it was, it did not afford him enough disposable income to explain his assets. His ownership of a house and stocks, cash in the bank and presence with $60,000 of unexplained cash (the currency of drug dealing) indicate that he has resources that cannot be explained by his lawful income. The defendant's criminal history is troubling. The defendant's argument that he hasn't incurred a new conviction in fifteen years borders on disingenuous, given that he was in prison from 2005 through the fall of 2017. That 2005 conviction was for the same type of offense with which the defendant is charged here—conspiracy to possess with intent to distribute cocaine and crack. Dkt. No. 44 at 6. That was a significant conviction—the defendant originally was sentenced to 312 months—

20

twenty-six years—in 2005; changes in the law resulted in three sentence reductions, to a final sentence of 162 months, or thirteen and a half years, still a very significant penalty. Id. At the time the court sentenced the defendant on the 2005 case, he had an undischarged term of imprisonment from *another* federal conviction, a 2002 charge for being a felon in possession of a firearm, for which he was sentenced to seventy months in custody. Id. at 5. Three years prior to his arrest on that charge, the defendant was convicted of committing battery to a police officer; earlier that same year, he was convicted of battery after violating a nonviolent no-contact order. Id. at 4-5.

Equally concerning is the court's analysis of the §3142(g)(3)(B) factor, which asks "whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of a sentence for an offense under Federal, State, or local law." The defendant began his supervised release on the 2005 case on October 26, 2017. Dkt. No. 44 at 6. The indictment alleges that this conspiracy began in approximately May 2019—just over a year and a half later. There is more in the defendant's history that indicates that he is unlikely to comply with conditions of release if he is not detained. When the defendant was convicted in 1998 of battery to a police officer, the state court imposed a sentence of two years of prison but stayed that sentence and placed him on two years of probation. Id. at 5. The court imposed that sentence in July 1999, but revoked the probation in February of 2002 because the defendant absconded for approximately two years and eventually was arrested on new charges. Id. Given

Case 2:20-cr-00088-PP-WED   Filed 11/13/20   Page 21 of 25   Document 134

the timing, it appears those new charges may have been the federal felon-in-possession charge in which he received the seventy-month sentence. Id. Also in 1998 the defendant was charged with bail jumping for violating the no-violent-contact order. Id. at 4. This factor weighs heavily against a finding that there is any condition or combination of conditions that would assure the defendant's appearance or the safety of the community.

### §3142(g)(4)—nature and seriousness of the danger to any person or the community posed by release

The danger the defendant poses to the community if released is that he will continue to do what he did before his 2005 conviction and what it appears he has done for at least some of the time since his release—he will work with others to put drugs on the streets of the community. In 2005, he was convicted of conspiracy to distribute cocaine and crack. Now, he is alleged to have conspired to distribute heroin, a drug far more lethal and destructive.

While there are some factors under §3143(g)(3)(A) that weigh in favor of release, the remaining factors all weigh in favor of a finding that there is no condition or combination of conditions that would assure the safety of the community. The court has not mentioned the fact that if convicted, the defendant faces a mandatory minimum sentence of ten years in prison—close to the amount of time he served on the 2005 conviction. While the defendant does not present a risk of flight in the sense that he has family and ties to this community, the penalty he faces is a powerful incentive to abandon those ties, particularly for someone who has spent more of his adult life in prison than outside it.

The defendant also has argued that it may take years for this case to resolve. Multi-defendant cases involving conspiracies that span months or years are complex and often do take longer to resolve. The coronavirus pandemic has caused delays in lawyers being able to visit their clients, in clients being able to review their discovery, in courts being able to hold hearings, and it appears that that logistical difficulty may be with us for some time. But time to resolution is not a factor Congress has directed the court to consider under §3143(g).

The statute directs the court to consider whether there is any condition or combination of conditions that would assure the defendant's appearance and the safety of the community. The defendant proposed in his motion to reconsider that he live with his cousin or with Ms. Bautista, and argued that the court could alleviate any concerns by requiring him to submit to location monitoring. Dkt. No. 120 at 9. These conditions would neither assure the defendant's appearance nor the community's safety. The defendant appears to have been living with Ms. Bautista when he was arrested in a residence with $60,000 which both claimed they did not own and a gun in a case with the defendant's fingerprint on it that Ms. Bautista claimed he knew nothing about. The court does not have information about the defendant's cousin, but location monitoring would not prevent the defendant from conspiring with others to distribute drugs; he could do that from anywhere, as evidenced by the fact that much of the evidence in this case comes from recordings of phone conversations. The defendant has not proposed that he put up property to

secure his release, and if he did, the court would question the source of the funds to pay for that property.

Finally, the defendant cited Fed. R. Crim. P. 32.1 as a basis for his request for release. That rule governs revocation or modification of supervised release. Section (a)(6) of the rule allows a magistrate judge to release or detain a person pending further revocation proceedings and places the burden of establishing by clear and convincing evidence that the person is not a risk of flight or a danger to the community on the person seeking release. On March 30, 2006, Judge Barbara B. Crabb in the Western District of Wisconsin sentenced the defendant to serve 312 months in custody, to run concurrently with the undischarged term of imprisonment in his 2002 federal case. United States v. Barragan, 19-cr-178 at Dkt. No. 1-1. On October 10, 2019—five months before the alleged start of the conspiracy—this court granted a request to transfer the defendant's supervised release from the Western District to the Eastern District. Id. at 2. While the government announced at the June 23, 2020 hearing that this court had issued a warrant in that case to act as a detainer, (Dkt. No. 66 of the 2020 case, page 1), the court has not scheduled any revocation proceedings in the 2005 case. But the court's findings under §3142(g) make clear that the defendant could not meet his burden for release pending further revocation proceedings under Rule 32.1(a)(6).

The court concludes that there is no condition or combination of conditions that would assure the defendant's appearance or the safety of the

24

Case 2:20-cr-00088-PP-WED   Filed 11/13/20   Page 24 of 25   Document 134

community. There is clear and convincing evidence that the defendant poses a danger to the community.

The court **GRANTS** the defendant's motion to reopen the detention proceedings. Dkt. No. 131.

The court **DENIES** the defendant's request for an order releasing him on conditions pending trial. Dkt. No. 131.

Dated in Milwaukee, Wisconsin this 13th day of November, 2020.

<div style="margin-left:40%">

**BY THE COURT:**

_____
**HON. PAMELA PEPPER**
**Chief United States District Judge**

</div>